# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MOHSEN SALEH AWAD, | ) |
| *Plaintiff,* | ) ) ) No. 19 C 10 |
| v. | ) ) Judge Virginia M. Kendall |
| U.S. DEPARTMENT OF STATE, | ) ) |
| *Defendant.* | ) ) ) |

## MEMORANDUM OPINION AND ORDER

The Plaintiff in this case previously held a United States passport in the name of Mohsen Saleh Awad. That, he says, is his name. But the Department of State believes otherwise. In 2012, at a United States Consulate in Yemen, Awad's daughter signed a statement attesting that Mohsen Saleh Awad was a fake name that the Plaintiff had used to immigrate to the United States. Relying on this statement, the Department of State revoked Awad's passport.

Awad requested a hearing regarding the revocation. At that hearing, he testified that Mohsen Saleh Awad was his name, and his daughter testified that she had given her statement under duress. The hearing officer found that the testimony of Awad and his daughter was not credible and instead credited the agent who had taken the statement and who testified that he had not threatened or restrained Awad's daughter. The Department accepted the hearing officer's determination and upheld the revocation.

Awad then filed the present action, seeking review of the Department's revocation of his passport. Prior to filing any dispositive motions, Awad moved for a preliminary injunction ordering the Department to issue him an interim passport pending resolution of the case. (Dkt. 20). Because Awad has not shown a likelihood of success in this case, his motion is denied.

## BACKGROUND

Plaintiff Mohsen Saleh Awad previously held a United States passport, which he obtained after naturalizing. On July 5, 2017, Awad received a letter from the Department of State notifying him that his U.S. passport had been revoked pursuant to 22 C.F.R. § 51.62(a)(2), which provides that the Department of State may revoke a passport if it "was illegally, fraudulently or erroneously obtained." (Dkt. 19-1 at 101). The letter stated that Awad's daughter, Zuhour Attaf Saleh Kurwash, had provided a sworn statement detailing that Awad's true identity was that of Attaf Saleh Kurwash. (*Id.*). Zuhour's statement, in pertinent part, stated:

> My true and correct name is Zuhour Attaf Saleh KURWASH. . . . My father, Attaf Saleh KURWASH, immigrated to the United States under the assumed name Mohsen Saleh AWAD. My father filed an immigrant visa petition on my behalf under the fake/assumed name Zuhour Mohsen Saleh AWADH. . . . I lied to the Consular Officer during my visa interview, claiming that my true name was Zuhour Mohsen Saleh AWADH.

(*Id.* at 16). The Department of State therefore determined that Awad made false statements of material fact in obtaining a passport using the name Mohsen Saleh Awad, and it revoked his passport pursuant to 22 C.F.R. § 51.62(a)(2).

As he was entitled to do, Awad requested a hearing on the revocation. *See* 22 C.F.R. § 51.70. A hearing officer held a hearing on September 27, 2017. (Dkt. 19-1

at 88). At the hearing, Awad argued that he had not misrepresented his real identity, and that his daughter had been forced to attest as much under duress. (*Id.* at 126).

Awad testified at the hearing. He stated that his name was Mohsen Saleh Awad and he had never gone by the name of Attaf Saleh. (*Id.* at 127, 129, 131). He stated that his wife's previous husband, who is deceased, was named Attaf Saleh. (*Id.* at 128, 130). Counsel for the Department confronted Awad with certain pieces of evidence. She showed him his application for naturalization, in which he had noted that he wanted to change his name to Ataf Saleh Awad but had then crossed it out. (*Id.* at 85, 129). Counsel for the Department asked him why he had wanted to change his name, and he responded, through the interpreter, "Because he has legal rights to change his name." (*Id.* at 130).

Counsel for the Department also noted that in various immigration applications, Awad had been inconsistent on whether he had adopted children. In a 1990 application for naturalization, Awad listed that he had only three children (his biological children), but later filed a petition in support of his adopted son, which noted that he had adopted his three stepchildren in 1989. (*Id.* at 86–87, 130–131). In response, Awad stated that he had relied on his lawyer to submit his materials and that he didn't list his adopted children "because he could not bring them all at one time. It was too much for him." (*Id.* at 131). Awad testified inconsistently at the hearing as to whether he had in fact adopted his stepchildren. (*Id.* at 129–30).

Awad's daughter, Zuhour, also testified at the hearing. (*Id.* at 132). Zuhour testified that she signed the statement at the U.S. Consulate in Sana'a, Yemen. (*Id.*

at 132). She testified that she arrived at the embassy at 8:00 a.m. and the waiting room was full. (*Id.* at 132). She was the last person seen that day, and when she was the only person left in the waiting room, she asked the cleaning staff to call someone for her. (*Id.* at 132). Someone came to get her, and she was taken to a "very scary room with all these armed people." (*Id.* at 132–33). She was then led to a small room and was there alone with men, which is not allowed in her tradition and religion. (*Id.* at 133). She was told that the "counsel" there was very mad at her. (*Id.* at 133). The counsel insisted that her father had changed his name, although Zuhour stated that she had only known her father by one name. (*Id.* at 133). She was told that if she did not confess, she would not be allowed to go to the United States. (*Id.* at 133). She then asked to be let out of the room and was let out. (*Id.* at 133). She returned to the waiting room, where a Yemeni man told her that the "counselor is very mad at you" and that she had to confess and say what he wanted. (*Id.* at 133). The Yemeni man told her not to be afraid for her father and brother because they were U.S. citizens and "nobody can come close to them." (*Id.* at 133). Zuhour testified that she believed the people at the consulate would kill her if she did not say what they wanted and so she signed the statement just so that she could leave. (*Id.* at 133).

On cross-examination, Zuhour told counsel for the Department that no one had told her that she could not leave the waiting room, but she chose not to leave because she was alone and was scared and confused. (*Id.* at 135). She stated that, at some point, once she had been taken into the interview room, she told the interviewer that she did not know the information about her father, and that they should just call him,

but when she tried to leave, the Yemeni man grabbed her and had her sit down again. (*Id.* at 136). When counsel for the Department asked Zuhour if the American interviewer threatened her, she said no, that the only threat he made was that she would not be able to travel to the U.S. (*Id.* at 135).

The Department of State called Agent David Howell as its witness via phone. (*Id.* at 137). Agent Howell was the Assistant Field Security Officer for Investigations in Sana'a at that time and was the person who interviewed Zuhour. (*Id.* at 137). Agent Howell primarily investigated fraud cases. (*Id.* at 137). When doing so, he relied on interviews rather than documents because it was easy to fraudulently obtain documents in Yemen. (*Id.* at 138). Agent Howell had only a basic recollection of his interview with Zuhour but remembered her because he interviewed few women and did not often interview a person regarding another subject. (*Id.* at 138, 141). Agent Howell did not recall Zuhour being visibly upset during the interview. (*Id.* at 141). For Zuhour's interview, Agent Howell worked with another agent named Mohammed who served as a translator between English and Arabic. He knew that he worked with Mohammed that day because he had reviewed Zuhour's statement and recognized Mohammed's signature. (*Id.* at 139–40).

Agent Howell testified that he had general procedures that he followed in every interview. (*Id.* at 138). Once he had interviewed someone, he would escort the interviewee back to the waiting room while he drafted a statement. (*Id.* at 141). He would then bring the interviewee back to the interview room and go over the statement in

both English and Arabic. (*Id*. at 141). If the interviewee agreed with the statement, the interviewee would sign and fingerprint it. (*Id*. at 141–42).

Agent Howell testified that there was one armed marine who you had to pass by before entering the interview room, but you could generally not see the marine's sidearm as he is positioned behind a glass window that cuts off above his waist. (*Id*. at 139). The interview room did not have windows, but it was air conditioned and had water and soft drinks. (*Id*. at 140). Agent Howell testified that when people no longer wanted to talk, they were permitted to leave the interview room and the interview would be terminated. (*Id*. at 141). In his role, he never detained or arrested people nor threatened to do so. (*Id*. at 140). He did not threaten anyone that if they did not sign a statement he would deny their visa and stated that, in fact, it was not within his authority to grant a visa. (*Id*. at 143).

After the hearing, the hearing officer recommended that the Department uphold the decision to revoke Awad's passport. (*Id*. at 88). In his written recommendation, the officer began by noting that Zuhour's statement that her father had used an assumed identity in the United States, if reliable, was sufficient evidence to support revoking Awad's passport. (*Id*. at 92). The hearing officer determined that the statement was in fact reliable. In doing so, the officer credited Agent Howell's testimony over that of Zuhour. Given Agent Howell's testimony, the officer determined that Zuhour had not faced multiple armed people nor had she been threatened with cancellation of her visa. (*Id*. at 93). The officer also found Zuhour's claims that she feared for her life and was held in the consulate not to be credible. (Dkt *Id*. at 93–94). He

noted that she had provided contradictory testimony on whether she was permitted to leave the interview room. (*Id.* at 94). Agent Howell, on the other hand, had unequivocally testified that individuals were free to leave the consulate and terminate interviews. (*Id.* at 94). Finally, the officer determined that Zuhour had a full understanding of the statement she had signed, given her testimony regarding the topic discussed at the interview and Agent Howell's testimony that it was a general practice for statements to be translated and reviewed line by line. (*Id.* at 94).

The hearing officer also noted serious credibility issues with Awad himself. For one, he pointed out the naturalization application in which Awad had initially sought to change his name to Ataf Saleh Awad, despite the fact that Awad had previously testified that he had never used that name. (*Id.* at 94). The hearing officer noted Awad's odd rationale for this potential name change—solely that it was his legal right. (*Id.* at 94). The officer found it "inconceivable that Petitioner would seek to legally change his given name to the same given name as his wife's deceased ex-husband simply because it was within his rights to do so," and stated that the "fact that Petitioner attempted to legally change his name during the naturalization process to one very similar to the name his daughter admitted to being his true identity cannot simply be a coincidence." (*Id.* at 94–95). The hearing officer also pointed out the discrepancies in Awad's previous immigration applications regarding the adoption of his stepchildren, as well as contradictory statements about when he was married. (*Id.* at 95).

The hearing officer recognized facts that weighed against revocation, including that Awad's naturalization certificate had not been revoked and that that no immigration proceedings had taken place against Zuhour.  (*Id.* at 95).  He also recognized that proceedings against Awad's son had terminated in the son's favor (discussed further in the discussion section, below).  (*Id.* at 95).  With those facts in mind, however, the hearing officer still concluded that Awad had not shown that the Department had acted improperly in revoking his passport.  (*Id.* at 95–96).

Awad received the hearing officer's decision on November 8, 2017.  (*Id.* at 148).  In early January 2019, he filed the instant suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.  *See, e.g., Saleh v. Pompeo*, 393 F. Supp. 3d 172, 180 (E.D.N.Y. 2019) (review of passport revocation pursuant to 22 C.F.R. § 51.62(a)(2) is appropriately brought under the APA); *Awad v. Kerry*, 257 F. Supp. 3d 1016, 1020 (N.D. Ill. 2016) (reviewing passport revocation pursuant to 22 C.F.R. § 51.62(a)(2) under the APA).  Awad also asserts violations under the First Amendment of his rights to marry and of free association, and under the Fifth Amendment of his rights to due process and to travel freely.  (Dkt. 1 at 9).

## **DISCUSSION**

Awad has moved for a preliminary injunction granting him an "interim travel document" so that he may visit his wife in Yemen pending resolution of this case.  (Dkt. 20-1 at 1).  Although in his complaint Awad also makes claims under the First and Fifth Amendments, his motion for a preliminary injunction is based on his

argument that the Department's decision was arbitrary and capricious. The Court, therefore, addresses his arguments only as they pertain to his APA claim.[1]

"To win a preliminary injunction, the moving party must establish that (1) without preliminary relief, it will suffer irreparable harm before final resolution of its claims; (2) legal remedies are inadequate; and (3) its claim has some likelihood of success on the merits." *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018). "If the moving party makes this showing, the court balances the harms to the moving party, other parties, and the public." *Id.*

Awad largely seeks to rehash his hearing, arguing that Zuhour's statement was not reliable and that Agent Howell's testimony was not credible. It is not this Court's role, however, to reweigh the evidence and make credibility determinations. Instead, this court reviews whether the Department's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Under this highly deferential standard, an administrative decision should be upheld as long as the agency's path may be reasonably discerned." *Sierra Club v. U.S. E.P.A.*, 774 F.3d 383, 393 (7th Cir. 2014) (internal quotation marks omitted).

Awad has not shown that he is likely to succeed in showing that the hearing officer's decision was arbitrary and capricious. The hearing officer carefully weighed the testimony of Awad and his daughter against that of Agent Howell and credited

---

[1] While Awad, in his motion, makes passing references to due process and the right to travel, he makes no legal arguments relating to these rights. As a result, this Court declines to address the constitutional claims Awad asserts in his complaint. *See United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) (noting that courts are not obligated "to research and construct the legal arguments open to parties, especially when they are represented by counsel" (internal quotation marks omitted)); *see also Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (noting that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived").

Agent Howell. He provided logical reasons to support his credibility determination, including the contradictions in both Awad's and his daughter's testimony, described above, as compared to the unequivocal testimony of Agent Howell, an experienced agent. Specifically, the hearing officer questioned Zuhour's testimony about fearing for her life and fearing she would not be able to leave the consulate. In doing so, he pointed to contradictory testimony she gave about whether she was able to leave. Conversely, Agent Howell had given unequivocal testimony, including that interviewees were permitted to leave at any point. As the hearing officer noted, Agent Howell's testimony largely corroborated that of Zuhour, for example he described the layout of the consulate and the room Zuhour was taken to in a very similar manner. (Dkt. 19-1 at 93). And as the officer noted, Agent Howell had significant experience with American consulates and embassies. Given the lack of inconsistency in Agent Howell's testimony and his experience, the hearing officer gave logical reasons for crediting Agent Howell.[2] The hearing officer also gave a reasoned explanation as to why he discredited Awad, including Awad's lack of explanation for why he sought to change his name upon naturalization and the discrepancies in his prior immigration applications. (*Id.* at 94–95). Far from being arbitrary or capricious, the hearing officer's reasoning is sensible and persuasive.

---

[2] Awad argues that the hearing officer did not address whether Zuhour was threatened by the "Yemeni guy," presumably "Mohammed." Zuhour, however, did not testify that Mohammed threatened her. She testified that he told her she should not be afraid that her brother or father would be harmed and that they would not be harmed because they were U.S. citizens. (Dkt. 19-1 at 133). Further, the officer did address this, in the general sense that he found that she freely gave the statement and could have left at any point—she was not coerced by Agent Howell or otherwise.

Awad makes several arguments as to why the hearing officer's decision was unsupported. For one, Awad argues that his inconsistency around whether he adopted his stepchildren does not mean he was not credible. He argues that he was simply confused about what adoption means, as it has a different meaning under Islamic law. (Dkt. 20-1 at 12). This argument is not persuasive. By the time of the hearing, Awad had previously petitioned on behalf of his adopted son and in doing so submitted documents reflecting his adoption. Given this history, it was reasonable to infer that, by the time he testified, Awad knew that he had adopted children.

Awad also repeatedly references that Agent Howell had only a "basic recollection" of the interview. This understates Agent Howell's testimony, in which he stated that he specifically recalled the interview given that he infrequently interviewed women and infrequently interviewed someone who was not the subject of an investigation themselves. On top of this, he testified unequivocally that he followed certain procedures, including allowing individuals to terminate interviews and leave, providing translation, and never threatening anyone. Opposed to what Awad argues, Agent Howell's testimony shows both that he recalled interviewing Zuhour and recalled certain procedures he followed in all cases at that time.

An additional point worth mentioning is the decision in *Awad v. Kerry*, 257 F. Supp. 3d 1016 (N.D. Ill. 2016), involving the passport revocation of Awad's son, Zuhour's brother. Awad suggests that the case calls Zuhour's statement into question. (Dkt. 20-1 at 9 n. 1). In that case, however, the district court held that the Department could not rely on Zuhour's statement as the basis for revoking her

brother's passport, as her statement makes no mention of any false identity of her brother. *Awad*, 257 F. Supp. at 1021–23. The case does not address the reliability of Zuhour's statement, it merely notes that the statement did not reference her brother.

Along with credibility, the parties dispute the significance of the fact that Awad holds a certificate of naturalization in the name of Mohsen Saleh Awad. While Awad's certificate of naturalization serves as proof of citizenship, the Department says, it is not an identity document. A passport, on the other hand, provides proof of identity as well as proof of allegiance. *See Haig v. Agee*, 453 U.S. 280, 293 (1981). As a result, when issuing a passport, the Department also verifies the identity of the applicant. 22 C.F.R. § 51.23. And if an applicant makes a material misstatement about who he really is, *i.e.* about his identity, he has obtained the passport illegally and fraudulently. *See* 8 U.S.C. § 1504(a); 22 C.F.R. §§ 51.20(b); 51.62(a)(2). While the certificate of naturalization may prove that the holder has obtained citizenship, it does not prove that the holder is who he says he is—in other words, it does not prove his identity as the person in whose name the certificate was issued. The Court agrees with the Department's assessment that it is under no requirement to issue a passport to an individual who may have previously used multiple identities—including to obtain a naturalization certificate—if the Department has reason to believe that the individual is not who he says he is.

Awad, however, argues that, regardless of whether he previously used another name, the name on his certificate of naturalization became his name when he naturalized. (Dkt. 20-1 at 13). He therefore could not have applied for a passport using

any other name than the one on his certificate of naturalization, Mohsen Saleh Awad. To support this argument, however, Awad relies on a district court opinion from the Northern District of California, which was subsequently vacated. *Omar v. Tillerson*, No. 15-CV-01760-JSC, 2017 WL 5751314 (N.D. Cal. Nov. 28, 2017), *vacated sub nom. Omar v. Pompeo*, No. 3:15-CV-01760-JSC, 2018 WL 4191416 (N.D. Cal. Aug. 16, 2018). This Court agrees that Awad's case is in an unusual posture—the Department does not challenge Awad's naturalization under the name Mohsen Saleh Awad, yet argues he cannot receive a passport in the name under which he is recognized as a United States citizen. The sole authority Awad relies on, however, to argue that the Department cannot take such action, is a vacated opinion from another district. This Court does not find that authority persuasive. But the Court remains open to hearing more about this argument on a motion for summary judgment if Awad can provide proper support for it.

What the Court is left with is the hearing officer's reasoned decision to credit Agent Howell's testimony and Zuhour's sworn statement, and the Department's convincing argument that it need not issue identification documents to those who mispresent their identity. Under these circumstances, this Court cannot conclude that Awad is at all likely to succeed on his APA claim. His argument that he is entitled to preliminary injunctive relief therefore fails.

As Awad failed to make the initial showing required for a preliminary injunction, the Court need not proceed to balancing the harms. *Proft v. Raoul*, 944 F.3d 686, 693 (7th Cir. 2019) ("If the moving party fails to make this showing, the court

does not have to proceed to balancing the resulting harms."). That being said, the Court finds it worth noting how little evidence Awad has provided regarding the harm he would face if he does not receive relief prior to the final resolution of this case. The harm Awad alleges he is facing is the separation from his wife, who is in Yemen, and the resultant impact on his health. (Dkt. 20-1 at 14). Awad states that he has "medical conditions, including diabetes, high cholesterol, hypertension, and insomnia, that can be aggravated by stress, such as the stress of facing further long-term separation from his wife." (Dkt. 20-1 at 14). To support this assertion, he provides an extremely brief letter from his doctor which does not explain how serious these conditions are or how exactly the separation aggravates them. (Dkt. 20-2 at 5). In December 2019, Awad submitted an additional one-paragraph letter from his doctor, again providing very little detail. (Dkt. 30-1 at 1). It notes that, during Awad's separation from his wife, his "condition" has worsened to hopelessness and he is expressing suicidal ideation. (Dkt. 30-1 at 1). The letter urges that he be reunited with his wife to "lift this burden" and improve his health. It also attaches information on cataract surgery without explaining what relevance this has to the current case. (Dkt. 30-1 at 2–4). Again, the letter does not provide any details of his "condition" or explain how exactly it is connected to the separation from his wife or how seeing her would remedy what is apparently a medical condition.

Awad has stated that his wife is a native and citizen of Yemen, and that she did not immigrate to the United States with him. (Dkt. 20-1 at 2). Awad notes that "throughout the years, he has regularly returned to visit her in Yemen" but provides

no further detail on how regularly they have seen each other. (Dkt. 20-1 at 2). On the limited record before this Court, all that is known is that Awad and his wife have been living as citizens of different countries for nearly three decades. The Court does not know how regularly they visited each other prior to the current separation and whether the current length of separation may be typical for them.

Further, the record reflects that some of the delay here is attributable to Awad himself. Awad did not file this suit until January 2019 despite being able to do so as of receipt of the hearing decision in November 2017. This additional fourteen months of separation was the result of his own inaction and does not support his argument that he must see his wife imminently. *Cf. Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered.").

## **CONCLUSION**

For the foregoing reasons, Awad has failed to establish that he is entitled to the "extraordinary remedy" of preliminary injunctive relief. *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). The Court therefore denies his motion for a preliminary injunction.

_____
Virginia M. Kendall
United States District Judge

Date: March 12, 2020